And we'll turn to the first case before us, USA v. Crawford. Thank you. May it please the Court, my name is Danielle Nerone-Riley and I do represent the appellant in this case, Glendon Scott Crawford. I have reserved two minutes for rebuttal. Prior to getting into the statutory construction and the review under the statutes in this case, I would ask this Court to consider the two evidentiary rulings that were made, and I'm asking the Court to reverse based on the abuse of discretion, specifically the prejudicial information regarding the affiliations of my client, Mr. Crawford, the highly prejudicial nature of that, as well as the rule of completeness. Specifically, defense counsel at the time of the trial had indicated to Judge Sharp that he in fact wanted to play the entire videos of which the government had taken snippets out, and I think that the Court should review that for an abuse of discretion because pursuant to the rule of completeness, I think that was the defendant's right to play that in its entirety if in fact he wanted to. To not allow that was prejudicial and also detrimental to my client's . . . The entire video was in evidence, so . . . Correct. But they would not allow Mr. Leweybrand to play that for the jury. The judge in essence said . . . Where's the denial of that request? It's in the transcripts. Okay. Where in the transcripts? Well, I cited to in my rule of completeness argument wherein the Court has a discussion with Mr. Leweybrand that in fact he was only allowed to play . . . If he wanted to give the snippets that he wanted, that was fine, but he was not going to allow Mr. Leweybrand to play it in its entirety. Specifically, I have it specifically, the judge has indicated that it's incumbent upon the defense to give them notice of what you want to hear, free the defendant to call its own witnesses, but the judge in fact indicates, and it's in the transcripts of those pages, that he's not going to allow Mr. Leweybrand to in fact play the entire portions. So I think that's an abuse of discretion specifically since he's allowing the government to put forth the snippets that they want to put forth. So your contention is that only putting in the entire video would suffice? Correct, at that point. And that's because . . . I just did a trial up in the Northern District when the judge said to me, it's the defendant's right to put it in, and if the jury gets bored and the jury doesn't want to hear it, well, then that falls upon the defense. But to not allow it played while allowed snippets was prejudicial, and that's what I'm asking. What is it about playing the whole thing that was meaningful to his defense? Mr. Crawford is one of those down . . . . . . is ensuring that when someone takes a portion out of a video or an audio, that the defendant is given the opportunity to use the other portions to flesh it out, to give meaning to it. It doesn't mean that a judge has to give the whole thing every time. The jury is given a complete picture of the meaning or the distinction that people are trying to draw. So how is he prejudiced in this sense here? What was it that he wanted to show by playing the entire thing? He wanted to show how the government was controlling this, how the government was, in fact, the one who was leading, and how the government was, in essence, the one calling the shots. And if you read that, and if you see it in its entirety, that picture is borne out. To just allow the snippets where it's highly prejudicial to say, you know, he said a lot of inflammatory things, but those were seconds out of hours of conversations that would have given a jury a better picture of what was occurring. And for that reason, I'm asking the Court on that to reverse. No specific passages were identified by the defendant. No, he didn't. He said that he had just learned the prior Saturday that the government wasn't going to put it in its entirety. But, be that as it may, I do want to discuss with respect to the fact that Mr. Crawford was charged in that indictment with three separate counts, and I think for the reasons set forth in my brief, as well as the evidence adduced at trial, that none of those convictions can, in fact, stand. Specifically, I want to talk about the attempt to produce and use radiological dispersal devices in count one. In my papers, as well as the argument that I had attempted to bring to Judge Sharpe's attention, 232, 2332, subdivision H, doesn't apply to the actions of Mr. Crawford. As we talked about, and as the Court can look at in the 2004 Congressional Intentions or Congressional Findings, that applies to dirty bombs. It doesn't apply to the facts of this case wherein it is, in other words, there isn't a device that was capable of and designed and intended to endanger human life. 2332 was intended to be used to endanger human life, in fact, to end it. I don't read it the same way. I believe that 232... You don't read the record the same way, or you don't read the statute the same way? The statute the same way. I think that Congress was very clear with the passage of this statute that it, in fact, attacked weapons that had no legitimate private use and no legitimate use. I think that with respect to the fact that 2332H was designed to attack dirty bombs, it doesn't apply to the actions in this case, and specifically the weapon in this case. If we want to call it a weapon. That may have been a misstatement. With respect to the attempt to produce and use a radiological disperse device, I don't believe that the people or the government in this case had shown that this category. Similar under 2 and 3, the weapons of mass destruction, I think that it's similar again. It describes a weapon that is designed to release radiation, and release and emit are two separate and distinct actions, and as the Court can see in the 2332I, Congress then did legislate in favor of Mr. Crawford. As the Court is aware that the Congress is aware of existing law, and so the only way to look at 2332I is that there was no prior statute that had previously addressed it. And again, if you go through the cases that were cited, and there's very, very few, the release is a single explosion. It does not apply to emission, and it would direct the Court's attention specifically to the expert who testified in this case, and not once was the word release out of his mouth. He spoke about emissions, and he spoke about dispersal, but at no point did he in fact testify that this weapon or this otherwise x-ray machine could in fact ever have been used as a weapon. I see that my time is up. I will sit down. I have two minutes for rebuttal. Thank you. Good morning. Rajiv Dosanjh for the United States. Turning first to the issue of statutory construction, I think it's important to note that we are under a plain air review standard here, and under these circumstances, I think the Court would rightly be very reluctant to narrow the scope of this statute. No one is disputing that Congress, when they enacted this statute, had in mind as the impetus for the statute the threat of dirty bombs at the time, but it's important to know that they wrote the statute in broad language to encompass the potential ingenuity of people like Mr. Crawford who are intending to use radiation and radioactivity to harm people. Radiation is a very broad term. It's energy in transit in its most basic sense, and even if you're just limiting it to ionizing radiation, which is the kind of radiation that damages human tissue and causes genetic mutations, there's nothing illogical or somehow ungrammatical of speaking about the release of energy, and that's what radiation is. We talk about the release of energy all the time. I think the problem that Crawford is trying to identify here or somehow make into a problem is the idea that when we think of the release of something, we often think of something that is tangible first, but radiation, by using the term radiation, they were making it very clear that it was the release of energy that they were concerned about. The notion that this device somehow wasn't a weapon I think is also belied by Mr. Crawford's own words. He was seeking to weaponize this device, which does have legitimate private uses, but was, in his imagination and his design, was going to be transformed into a weapon that would be put in the back of a truck. You would attach a device that he used in this conspiracy to make a remote activation device and was going to park it near targets. I think it's very important for the court to understand that this was not some kind of harebrained scheme. This was, as the testimony of the experts who were extremely qualified to speak on this matter made clear, this was a very potentially deadly device when used in the way that it was used in the front of a storefront mosque, targets that he had scouted, and to leave it running, pointed at the building. As the testimony of the experts makes clear, it would have taken approximately an hour, if not less, to cause, to endanger human life or to actually kill. I want to also speak about the use of the evidence of his Klan affiliation. The identity of the organization was important here. Crawford used his membership in the Klan to establish credibility with the people he was meeting with, also to check their bona fides. At his first meeting with the undercover, he says, I don't know who you are, but if you were to join one of the organizations that I'm involved with, I could trust you enough to combine our agendas. He also believed that the Klan had the resources to obtain this device. These were expensive pieces of equipment. In his first meeting with, his first communications with the Klan leader in North Carolina that the government did not know about and were taken under his own initiative, he asked that we can, I want, what we need is the Klan to pool its resources to purchase this equipment. He tells one of the undercover agents that the Knights of the Ku Klux Klan may have the resources to bring the project to fulfillment. Again, this is, the identity of the organization was important here. It's also, his references to the Klan are intertwined throughout the proof, making it very difficult without distorting the evidence or confusing the jury to have exercised those. As far as the rule of completeness issue, it's important to note that the videos here that were played were extended clips. We were not splicing small amounts of video to create a distorted view. If we provided the videos to the court, the court can look at them. The defense counsel never identified, and even on appeal, we're not hearing what actual pieces, what precise pieces of the video were necessary to correct any kind of distortion here. Mr. Crawford, I think the evidence is very clear. He came in to the first meeting with the undercovers knowing precisely what he wanted to do, precisely the kind of device he wanted to get, what that was going to entail in terms of materials. He wasn't merely sharing an idea, as has been suggested on appeal. What he was doing was soliciting support, and financial support specifically, and also material in terms of the tubes. He says to the undercover almost immediately at the first meeting, the tube is the hard thing to do, asking for the provision of those tubes. Turning then to the other issues in the case, I think in terms of the duplicity of the indictment issue that was discussed, I think it's clear that the structure of the statute, by putting these lists of terms in one sentence with a disjunctive, is like many other statutes where the courts have said, these are all means of completing this crime. The verbs that are used are not so disparate as to and again, in terms of the duplicity argument, that is also a plain error argument. Finally, turning to the terrorism enhancement, I think again, the evidence is clear from both the trial record and the indictment, that the goal here was to intimidate and to influence the government. His targets were explicitly political. I think there's no question here that the terrorism enhancement should have applied. Unless there's any other questions, I will rest on the arguments in our brief. Thank you very much. Ms. Riley, you've reserved two minutes. I have, Judge. Thank you. With respect to the indication that the government wouldn't have been able to excise out the highly prejudicial information of any organizations that Mr. Crawford was affiliated with, I think that could have been accomplished with just a reference to organization without having to get into what actual organizations they were. It's not an element of crime. It was there specifically to prejudice the jury. Bad person. With respect to the actual possession or their use. With respect to the idea, I could see that. He is. It's relevant as to one aspect. I don't see how it is. A fellow contrives a plot to mass murder a large number of African Americans. He happens to be a member of the Klan. That's not relevant with regard to his motivation. His defense was always that he never intended to use it. He never picked the target. Again, if the court will look at the history of this, he brought his idea to a senator. He brought it to a Jewish consulate. He brought it to a lot of people. His problem was he couldn't keep his mouth shut. I understand. He told it to the Klan. He went to Jewish foundations saying I've got a great thing. The question is did he ever intend to use it. That's where we go with the entrapment. I understand. Your brief was very good. Thank you.